*Miguel Angel Santana v. State of Maryland*, No. 19, September Term, 2025. Opinion by Eaves, J.

**CRIMINAL LAW – MISTRIAL – PROHIBITION ON DOUBLE JEOPARDY – NO RECKLESS STATE ACTION**

The Supreme Court of Maryland assumed—without deciding—that Maryland's common law prohibition on double jeopardy bars a subsequent prosecution where the State's reckless action caused a criminal defendant to successfully move for a mistrial. With that assumption, the Court held that the circuit court's finding that the State did not engage in reckless conduct was not clearly erroneous. Therefore, the Court affirmed the judgment of the Appellate Court of Maryland, which affirmed the circuit court's denial of the petitioner's motion to dismiss based on Maryland's common law prohibition against double jeopardy.

Circuit Court for Charles County
Case No. 08-K-17-000083
Argued: October 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 19

September Term, 2025

---

MIGUEL ANGEL SANTANA

v.

STATE OF MARYLAND

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

---

Opinion by Eaves, J.
Watts, Biran, and Gould, JJ., dissent.

---

Filed: April 28, 2026

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

Under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, a defendant who requests, or acquiesces to, a mistrial ordinarily consents to a subsequent prosecution for the same charges.[1] An exception to this general rule is where the government engages in conduct with the intent of goading a defendant into moving for the mistrial.[2] In that instance, where a defendant successfully obtains a termination of the current trial, the Double Jeopardy Clause bars a government from initiating a subsequent prosecution for the same charges.[3] Although Maryland has no independent state constitutional or statutory provision enshrining the protections against double jeopardy, we recognize double jeopardy protections as a matter of common law.[4]

After two separate mistrials for various charges including murder, Miguel Angel Santana moved in the Circuit Court for Charles County to bar a third prosecution under Maryland's common law prohibition against double jeopardy. The circuit court denied that motion, finding that the State had neither intended to cause, nor recklessly caused, Mr. Santana to move for the second mistrial. The Appellate Court of Maryland affirmed.

---

[1] *United States v. Scott*, 437 U.S. 82, 93 (1978).

[2] *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982).

[3] *Id.*

[4] *State v. Long*, 405 Md. 527, 536 (2008).

We issued a writ of certiorari in this case to answer two questions,[5] which we slightly have rephrased:

1. Should Maryland's common law prohibition on double jeopardy bar retrial after a defendant successfully moves for a mistrial where the mistrial was caused by the State's reckless conduct?

2. If so, was the State reckless in this case?

For the reasons explained below, assuming—without deciding—that Maryland embraces a reckless standard under our common law double jeopardy jurisprudence, the circuit court made a finding of fact that the State was not reckless in this case, and that finding is not clearly erroneous. Given that holding, we decline to explicitly address the first question and affirm the judgment of the Appellate Court of Maryland.

**II**
**BACKGROUND**

*A.*     ***The Circuit Court for Charles County***

**1. Santana I: the first mistrial**

In 2019, Mr. Santana stood trial in the Circuit Court for Charles County on six different charges related to the 2016 murder of Lydell Wood ("Santana I"). Prior to trial, the State and Mr. Santana mutually agreed to exclude any evidence relating to firearms, ammunition, or marijuana recovered during a 2016 search of Mr. Santana's home (collectively referred to as "the excluded evidence"), as none of those items were relevant to the charges against Mr. Santana.

---

[5] *Santana v. State*, 490 Md. 630 (2025).

2

Corporal Stephen Cartwright, a member of the Charles County Forensic Science Unit, who executed the 2016 search warrant, testified during Santana I about a cellphone recovered during the search. The following exchange occurred during the State's direct examination of Cpl. Cartwright:

[THE STATE]: And what about [exhibit] 178?

CORPORAL CARTWRIGHT: It's a view of the area of the bed that we saw in the first picture, just the inside of it.

[THE STATE]: Okay, and is there a phone on the floor in 178?

CORPORAL CARTWRIGHT: Yes, ma'am, there's a phone right there.

Cpl. Cartwright never mentioned, nor was he asked about, the agreed-upon excluded evidence.

At the conclusion of Santana I, the jury found Mr. Santana guilty of conspiracy to commit first-degree murder and of illegal possession of a firearm by a disqualified person. The other four counts resulted in a hung jury, and the circuit court declared a mistrial on those four counts. The circuit court sentenced Mr. Santana to life in prison for the conspiracy conviction and to 1,017 days in prison for the firearm conviction (the time Mr. Santana had then spent in custody on that charge).

## 2. Santana II: the second mistrial

In 2023, the State retried Mr. Santana on the four counts that had previously resulted in a hung jury ("Santana II"). During the trial, the State again questioned Cpl. Cartwright. During his testimony, Cpl. Cartwright could not initially remember Mr. Santana's address where he had executed the 2016 search warrant. The State first

3

inquired whether Cpl. Cartwright's original report, a copy of which was "up there[ on the witness stand]" would refresh his recollection as to the address. Cpl. Cartwright indicated that it would not because the address would be on only his supplemental report. As a result, the State allowed Cpl. Cartwright to reference his supplemental report and "then put it away." The State was clear that it wanted Cpl. Cartwright to use his supplemental report to refresh his recollection as to "where that search warrant was [executed]" "and then put it away[.]"

The only content in the supplemental report that the State asked Cpl. Cartwright to review was the address of the property. As Mr. Santana notes, however, the supplemental report did not mention the cellphone, which ultimately was the subject of the testimony the State was attempting to elicit from Cpl. Cartwright. The supplemental report also referenced the excluded evidence.

After Cpl. Cartwright put away the supplemental report, the State asked Cpl. Cartwright about certain photographs of the residence where the search warrant was executed. Starting with State's Exhibit 175, Cpl. Cartwright testified that the photograph depicted a closet wherein Cpl. Cartwright observed a jacket with a fur hood. The State asked whether there was "anything *significant to the investigation* in that photograph?" (Emphasis added). Defense counsel objected, asserting that the State was leading; the circuit court overruled the objection, and Cpl. Cartwright confirmed that he collected the jacket depicted in Exhibit 175. The State then moved onto State's Exhibit 176:

[THE STATE]: Okay, okay. Can we now go to 176?

CORPORAL CARTWRIGHT: This was the master bedroom of that

4

residence.

[THE STATE]: Okay, did you collect anything in that room?

CORPORAL CARTWRIGHT: Yes.

[THE STATE]: Okay, what did you collect?

CORPORAL CARTWRIGHT: I believe we collected firearms and marijuana, as well as-

Defense counsel objected, and a bench conference ensued. Defense counsel expressed their intention to move for a mistrial, citing the parties' agreement prior to Santana I that the excluded evidence, or any reference thereto, would not be admitted into evidence.

The State explained that Cpl. Cartwright's discussion of the excluded evidence "[was] not the answer [it] was anticipating or trying to elicit[,]" "was sort of out of left field[]" and was "somewhat of a surprise[]" to the State. The State confirmed that it was not "anticipating that [Cpl.] Cartwright was going to talk about marijuana and guns[.]" While the State acknowledged that it prepped Cpl. Cartwright for his testimony in advance of Santana II, it could not recall whether it instructed him *not to discuss* the excluded evidence:

[THE COURT]: Did you say, "Listen, don't mention the firearms"?

[THE STATE 1]: He was prepared. I don't recall asking him specifically about that line of questions.

[THE COURT]: Okay, she is saying yes.

[THE STATE 2]: No, I am saying he was prepped.

[THE COURT]: Yeah.

[THE STATE 2]: I didn't specifically say that.

5

[THE COURT]: Okay, alright.

[THE STATE 2]: That's true.

[THE COURT]: So both can be true, he can be prepped and—

[THE STATE 2]: And when—

[THE STATE 1]: We talked to him about what we want, what we were talking about, where we are going.

[THE COURT]: Right, I gotcha.

[THE STATE 1]: Specifically, obviously, everything we have already talked about. And then we need to get to the search warrant, and it was the cell phones and the . . . the jacket.

The State believed that a curative jury instruction would be an adequate remedy over a mistrial. Defense counsel disagreed, arguing that (1) a curative instruction would not be adequate, (2) the parties did not encounter any problems with the pretrial agreement in Santana I, and (3) Cpl. Cartwright's response in this trial "was elicited."

The court informed the parties that it would need to review the exchange further, suggested they halt proceedings for the day, released the jury, and instructed the parties to return the following morning. The next day, the State indicated that it was "not opposed to [Mr. Santana's requested] mistrial," and the circuit court subsequently granted that motion.

**3. The motion to dismiss**

A new trial was scheduled for February 2024, but Mr. Santana filed a motion to dismiss, arguing that Maryland should adopt under its common law double jeopardy jurisprudence a standard that precludes subsequent prosecution where the State has

6

recklessly caused a defendant to successfully move for a mistrial. Mr. Santana neither claimed that the State acted intentionally, nor invoked the protections of the Fifth Amendment's Double Jeopardy Clause.[6] Under a recklessness standard, Mr. Sanatana argued that the State was reckless in failing to (1) advise Cpl. Cartwright not to discuss the excluded evidence and (2) question Cpl. Cartwright in a way that would avoid eliciting discussion of the excluded evidence. As a result of that reckless conduct, Mr. Santana argued that to retry him would violate Maryland's common law prohibition on double jeopardy.

In response, the State argued that it had prepared Cpl. Cartwright but did not anticipate the scope of his answer. Specifically, the State claimed that it had sought information about cellphones recovered by Cpl. Cartwright during his search, and that testimony regarding the excluded evidence certainly was not "what [it] was seeking to elicit, nor was it what [it] intended to elicit."

After a hearing, the circuit court denied Mr. Santana's motion to dismiss, providing the following reasoning:

> I could not find a Maryland [case] that directly mentioned recklessness. I think intent is really what, really what drives it in Maryland.
> So to me, you know, after listening to it, having my memory jogged, listening to the arguments, I don't think the State intentionally caused a mistrial. I don't think they were doing this for any sort of advantage, gain, to gain the upper hand on Mr. Santana or to deprive him of any sort of right

---

[6] As noted earlier, under the Fifth Amendment, the Double Jeopardy Clause affords protections in situations where the government intentionally provokes/goads a defendant into successfully moving for a mistrial. *See Kennedy*, 456 U.S. at 676. Mr. Santana concedes that the State did not act intentionally during Santana II. Consequently, he would be afforded no protection under the Fifth Amendment, which presumably explains why he did not argue as such.

or to introduce, and when I say the State, I mean the lawyers, or to introduce things into his trial purposefully that would prejudice him.

\* \* \*

I do note that the State was, or had attempted to lead the witness and I don't know if they were trying to lead the witness to avoid this issue, I'm not saying that, but I do think and I think I know where this case goes, but I do think we had a question that produced a -- the, an undesired answer, there was a request for a mistrial and we worked through that and I think that was appropriate.

And I think everything that happened, I don't think any of it was intentional to gain any sort of advantage, to prejudice [Mr. Santana]. *I don't even think it would meet the definition of reckless*. Unfortunate, for sure.

So I'm going to deny [Mr. Santana's m]otion.

(Emphasis added).

The circuit court did, however, grant Mr. Santana's request to stay the proceedings pending appeal, and Mr. Santana indeed noted a timely appeal.

## B. The Appellate Court of Maryland

In an unreported opinion, the Appellate Court affirmed the circuit court's denial of Mr. Santana's motion to dismiss. *Santana v. State*, No. 1572, 2025 WL 601454 at \*1 (Md. Ct. App. Feb. 25, 2025). The Appellate Court explained that mistrial/retrial law is an aspect of the Double Jeopardy Clause under the Fifth Amendment but is not a part of Maryland's double jeopardy common law.[7] *Id.* at \*4. Under Maryland common law, the court stated, double jeopardy concerns do not attach unless the court makes "a factual finding pertaining to the elements of the criminal charge[.]" *Id.* at \*5. Because the circuit

---

[7] By "mistrial/retrial" law the Appellate Court was referring to the notion that, at common law, double jeopardy protections were never implicated in the event of a mistrial—whether or not a government's conduct is the precipitating factor in a defendant's choice to move for that mistrial.

8

court did not make any factual findings regarding Mr. Santana's criminal charges, the Appellate Court held, his common law jeopardy rights did not attach. *Id.*

Even if jeopardy had attached in Mr. Santana's case, the Appellate Court stated that it nevertheless would not have adopted the reckless standard for which Mr. Santana advocated. *Id.* at *6–8. The Appellate Court further noted that Mr. Santana failed to challenge the circuit court's factual finding that the State's conduct was neither intentional nor reckless and that, even if Mr. Santana had properly presented those challenges, the circuit court's factual findings were not clearly erroneous. *Id.* at *8.

The Honorable Douglas R.M. Nazarian concurred in the judgment. While acknowledging that he was bound by current precedent from this Court, Judge Nazarian wrote separately because he believed that Mr. Santana's case presented an opportunity for this Court to expand Maryland's common law to include reckless prosecutorial misconduct as a basis to trigger double jeopardy protections and because he believed the circuit court was incorrect that the State was not at least reckless in this case. *Id.* (Nazarian, J., concurring). Regarding the former, Judge Nazarian's reasoning focused mostly on a criminal defendant's rights under the Double Jeopardy Clause "to complete their trial before [an] empaneled tribunal, and the right to retain primary control over the course to be followed in the event of such prosecutorial error." *Id.* at *12 (citation modified). Judge Nazarian also discussed other States that have expanded their standards beyond what the Fifth Amendment provides. *Id.* at *14–18. Concluding that Maryland's common law double jeopardy jurisprudence should be expanded, Judge Nazarian contended that the State's prepping and questioning of Cpl. Cartwright was reckless,

which, therefore, should bar the State from retrying Mr. Santana a third time. *Id.* at *18–20.

## III
## STANDARD OF REVIEW

For double jeopardy purposes, determining whether the State in a criminal trial acted with a particular mental state "merely calls for the [trial] court to make a finding of fact." *Oregon v. Kennedy*, 456 U.S. 667, 675 (1982). Such factual findings are reviewed on appeal under the clearly erroneous standard. *See United States v. Vallejo*, 297 F.3d 1154, 1162 (11th Cir. 2002) (noting that, on appellate review of a motion to dismiss for violation of double jeopardy, the reviewing court "review[s] the district court's factual finding[s] for clear error" and that the district court's "determination of the prosecutor's intent is a finding of fact[]"); *cf. Portillo Funes v. State*, 469 Md. 438, 462 (2020) (noting that, on appellate review of a motion to suppress, this Court "accepts the suppression court's factual findings and credibility determinations, unless clearly erroneous[]").

## IV
## ANALYSIS

While we decide this case on ground that the circuit court's finding that the State was not reckless was not clearly erroneous, as discussed below, we nevertheless find it prudent to discuss some of the features of double jeopardy, under both the Fifth Amendment and our own common law, as well as some principles of federalism that may come to bear on a future case.

### A.     *Principles of Double Jeopardy and Federalism*

"[T]he idea of double jeopardy is very old." *United States v. Wilson*, 420 U.S. 332,

10

339 (1975) (citation omitted). At common law, the most rudimentary concept of double jeopardy was that "a defendant should not be twice tried or punished for the same offense." *Id.* (citation omitted). Born out of that concept were three pleas in bar[8] that a defendant could assert—*autrefois acquit*, *autrefois convict*, and pardon. *See United States v. Scott*, 437 U.S. 82, 87 (1978). These pleas were asserted to prevent an individual from being retried for a crime if that individual had already been acquitted, convicted, or pardoned of the very same crime for which the government sought to initiate a second prosecution. *See North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (noting that double jeopardy "protects against a second prosecution for the same offense after acquittal[,]" "protects against a second prosecution for the same offense after conviction[,] and "protects against multiple punishments for the same offense[]" (footnotes omitted)). In that vein, the concept of double jeopardy embodied a respect for final judgments in criminal matters. *See Scott*, 437 U.S. at 92 ("[T]he primary purpose of the Double Jeopardy Clause was to protect the integrity of a final judgment[] . . . .").

As understood today, the Fifth Amendment's guarantee against double jeopardy has vastly expanded beyond its common law roots, protecting various interests and attaching before a final verdict is rendered. *See Wade v. Hunter*, 336 U.S. 684, 689 (1949) (recognizing a defendant's Fifth Amendment right to "have [their] trial completed by a particular tribunal[]"); *Green v. United States*, 355 U.S. 184, 187–88 (1957) (recognizing that the Double Jeopardy Clause guards against repeated attempts at

---

[8] A "plea[] in bar" was a plea "interposed in advance of a contemplated subsequent trial for the purpose of foreclosing that trial." *State v. Smith*, 244 Md. App. 354, 382 (2020) (quoting *Copsey v. State*, 67 Md. App. 223, 225 (1986)).

prosecuting an individual "thereby subjecting [them] to embarrassment, expense and ordeal and compelling [them] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [they] may be found guilty[]"); *Crist v. Bretz*, 437 U.S. 28, 37–38 (1978) (holding that the federal rule that jeopardy attach, in a jury trial, once the jury is empaneled and sworn in, is applicable to the States via the doctrine of incorporation); *Kennedy*, 456 U.S. at 675–76 (barring retrial after a defendant successfully moves for mistrial where the mistrial is predicated on the State's intent to goad the defendant into moving for that mistrial).

The protections afforded by the Double Jeopardy Clause under the Fifth Amendment have been incorporated against the States via the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 787 (1969). Once a federal right has been incorporated against the States, incorporation protects "against state invasion [for] the same privilege that the [federal right] guarantees against federal infringement[.]" *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). In our system of federalism, however, this Court remains the final arbiter on the interpretation of any facet of Maryland law—constitutional, statutory, or common. In that role, it is for this Court to determine whether "Maryland law . . . impose[s] greater limitations (or extend[s] greater protections) than those prescribed by the United States Constitution[.]" *Muskin v. State Dep't of Assessments and Tax'n*, 422 Md. 544, 556 (2011).

Thus, even when a federal right has been incorporated against a State, principles of federalism do not permit federal law to *alter* the protections or limits of state law. *See Virginia v. Moore*, 553 U.S. 164, 178 (2008) ("[T]he arrest rules that the officers violated

were those of state law alone, and as we have just concluded, it is not the province of the Fourth Amendment to enforce state law. That Amendment does not require the exclusion of evidence obtained from a constitutionally permissible arrest."); *Fuller v. Oregon*, 417 U.S. 40, 48 n.9 (1974) ("[T]he dissent purports to resolve questions of state [constitutional] law that this Court does not have power to decide." (citing *Murdock v. City of Memphis*, 87 U.S. 590 (1874))); *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940) ("It is fundamental that state courts be left *free and unfettered* by us in interpreting their state constitutions." (emphasis added)); *see also Hulit v. State*, 982 S.W.2d 431, 437 (Tex. Crim. App. 1998) (en banc) ("But [the Supremacy Clause] does not mean that a court, faithfully interpreting state laws, can only find in them protections that equal or exceed federal laws."); *Sitz v. Dep't of State Police*, 506 N.W.2d 209, 217 n.12 (Mich. 1993) ("It would be a mistake, however, to view federal law as a floor for state constitutional analysis; principles of federalism prohibit the Supreme Court from dictating the content of state law. In other words, state courts are not required to incorporate federally-created principles into their state constitutional analysis; the only requirement is that in the event of an irreconcilable conflict between federal law and state law principles, the federal principles must prevail." (citation omitted)); *State v. Brown*, 930 N.W.2d 840, 857 (Iowa 2019) (McDonald, J., concurring specially) ("The conclusion that this court can interpret the Iowa Constitution to provide *less or more* protection than a parallel provision of the Federal Constitution is inherent in the federal system." (emphasis added)); *id.* at 858 ("The Supreme Court is the final arbiter of the meaning of the Federal Constitution. In contrast, the Iowa Constitution applies to the state

government. This court is the final arbiter of the meaning of the Iowa Constitution. . . . This is true whether we interpret the Iowa Constitution to provide less or more protection than the Federal Constitution." (citation omitted)).

If a State affords its citizens less protections under state law than a federal counterpart, then the solution is simple: The individual need only invoke the protection of the federal right to receive those greater protections. *See Hulit*, 982 S.W.2d at 441 (Price, J., concurring) ("Of course, if a state gives less protection to its citizens than does the federal constitution, then a defendant normally must *ask for that greater federal protection in order to get it*." (citation modified)); Hans A. Linde, *E Pluribus— Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165, 179 (1984) ("The right question is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand. The answer may turn out the same as it would under federal law. The state's law may prove to be more protective than federal law. The state law also may be less protective. In that case the court must go on to decide the claim under federal law, *assuming it has been raised*." (emphasis added)).[9]

---

[9] Justice Linde was a member of the Oregon Supreme Court from 1977 to 1990 and was the author of that Court's opinion in *State v. Kennedy*, 666 P.2d 1316 (Or. 1983), the final decision in that case's saga after the Supreme Court's remand in *Oregon v. Kennedy*. Jeffrey Kovac, *Hans Arthur Linde (1924–2020)*, Oregon Encyclopedia, https://www.oregonencyclopedia.org/articles/linde-hans/. The understanding that the doctrine of incorporation does not automatically dictate the contours of state constitutional law, and the call for state courts to independently interpret their own constitutional provisions, is sometimes referred to as "New Judicial Federalism." *See* James A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich. L. Rev.

Maryland has no constitutional provision concerning double jeopardy, but our common law has provided "well-established protections" for that right. *State v. Long*, 405 Md. 527, 536 (2008). Prior to incorporation, "[t]he view in this [S]tate was that, under the common law's double jeopardy prohibition, jeopardy did not attach until the rendition of a verdict and that, therefore, a retrial following the declaration of a mistrial did not give rise to a double jeopardy problem." *Cornish v. State*, 272 Md. 312, 316 n.2 (1974); *see also Hoffman v. State*, 20 Md. 425, 434 (1863) (noting that, unless "there had been a final verdict either of acquittal or conviction, on an adequate indictment, the defendant could not be a second time placed in jeopardy for the particular offense[]" (quoting 147 *Wheaton's Crim. Law*)).[10]

Thus, it remains to be seen whether, under Maryland law, a mistrial triggers double jeopardy protections for a defendant at all.[11] Because we can resolve this case

_____

761, 762 & n.4 (1992). Justice Linde has been referred to as the "intellectual godfather" of New Judicial Federalism. *Id.* at 774.

[10] Consistent with our obligation to interpret our common law independently of the protections afforded by the Fifth Amendment, we have recognized that our double jeopardy jurisprudence "is not coextensive with the Fifth Amendment . . . in every way[.]" *Scott v. State*, 230 Md. App. 411, 435 (2016), *aff'd* 454 Md. 146 (2017). For example, we have extended our double jeopardy protections beyond the Fifth Amendment to instances where a trial court—even if improperly—has made a factual determination as to guilt or innocence. *See State v. Taylor*, 371 Md. 617, 644 (2002). *Contra Serfass v. United States*, 420 U.S. 377, 389 (1975) (holding that a judge's improper evaluation of the evidence during a motion to dismiss an indictment did not trigger double jeopardy protections because the jury had not yet been sworn in, meaning that jeopardy had not yet attached).

[11] The Appellate Court disagreed with Mr. Santana on that point. *See Santana*, 2025 WL 601454, at *5 ("The trial court's only factual finding pertained to prosecutorial conduct for purposes of determining the procedural issue. Accordingly, [Mr. Santana's]

15

without deciding that issue—which was not thoroughly briefed—by utilizing Mr. Santana's desired standard, we choose to do so and leave for another day the issues of whether mistrials, solely under Maryland common law, trigger double jeopardy protections and, if so, the parameters of those protections. *See Tracey v. Solesky*, 427 Md. 627, 639–42 (2012) (detailing the proper framework and analysis for altering the common law), *superseded by statute*, Md. Code Ann., Cts. & Jud. Proc. § 3-1901, *as recognized in 75-80 Props., L.L.C. v. Rale, Inc.*, 470 Md. 598, 632 (2020).

**B.    *The Circuit Court's Factual Finding that the State Was Not Reckless Was Not Clearly Erroneous***

Mr. Santana argues that the State's (1) failure to properly prepare Cpl. Cartwright prior to Santana II and (2) line of questioning for Cpl. Cartwright during Santana II was reckless conduct, i.e., that the State acted with a conscious disregard for a substantial and unjustifiable risk that certain harm would result from its conduct.[12]

---

common law double jeopardy rights have yet to attach."). The State agrees with the Appellate Court on that point. In its brief before this Court, the State questions whether Maryland's common law even applies to Mr. Santana's claim because Maryland has not clearly abandoned the common law's final verdict requirement except in cases where some or all of the factual elements of the crime have been resolved. *See supra* n.8. Thus, according to the State, "because granting Mr. Santana's mistrial motion resolved no factual issues, Maryland's common law of double jeopardy was not implicated." Mr. Santana responds, relying on our opinions in *Hubbard v. State*, 395 Md. 73, 91 (2006), and *Simmons v. State*, 436 Md. 202, 213 (2013), that double jeopardy protections under our common law already apply to mistrials because this Court has adopted the manifest necessity framework for granting a mistrial over a defendant's objection. Given that we resolve this case on a non-constitutional ground, we need not resolve this dispute today.

[12] Because we assume that the reckless standard for which Mr. Santana argues is applicable, we also assume his definition of reckless conduct for the purposes of double jeopardy. In doing so, we intimate no opinion on what the definition of recklessness might be *if* we were to adopt a reckless standard in the future.

As to pre-trial preparation, Mr. Santana asserts that the parties had agreed that "the State would prepare [Cpl. Cartwright] not to discuss [the excluded evidence]." Despite that agreement, Mr. Santana argues that the State "admittedly made no effort" to instruct Cpl. Cartwright not to discuss the excluded evidence. Even setting aside that agreement, Mr. Santana believes that the State's preparation of Cpl. Cartwright was reckless because it "failed to account for the foreseeable outcome that his testimony about the July 2016 search would naturally veer into discussion of the [excluded evidence,]" failed to account for the large temporal gap between the initial search, Santana I, and Santana II, and should have simply followed the same preparation it took for Santana I.

As to questioning, Mr. Santana posits that the State was reckless because (1) "there was no reason for the State to believe that [Cpl.] Cartwright would provide anything other than a full and complete answer" to its open-ended questioning, including reference to the excluded evidence; (2) giving Cpl. Cartwright his supplemental report, which mentioned the excluded evidence, made it "*more* likely [that Cpl. Cartwright would] testify about [the excluded evidence] than about the testimony the State sought to elicit[,]" which was not contained in the supplemental report, and (3) it departed from its method of questioning during Santana I, which successfully elicited testimony about the cellphone without reference to the excluded evidence.

The State contends that Mr. Santana simply is dissatisfied with the circuit court's determination and that his arguments "cannot be reconciled with the standard of review." The State marshals two arguments. First, it posits that "pretrial prosecutorial action—like preparing a witness—can hardly serve as the basis for the claim that the State" had a

"reckless disregard for the prospect of provoking a mistrial[.]" Even if such pretrial conduct could constitute recklessness, the State argues that its conduct here was not reckless because there was evidence that it prepped Cpl. Cartwright to testify about the specific item in which it was interested, i.e., the cellphone. Failure to explicitly instruct Cpl. Cartwright *not to discuss* the excluded evidence, the State argues, is not reckless. Second, the State argues that its questioning of Cpl. Cartwright was not reckless because it tried to control his testimony by instructing Cpl. Cartwright to put away the supplemental report after he used it to refresh his recollection as to the address where the warrant was executed. Additionally, the State argues that recklessness is belied by the fact that the State itself was surprised at Cpl. Cartwright's mention of the excluded evidence, given that he had refrained from mentioning the excluded evidence during Santana I.

We agree with the State's position that the circuit court did not commit clear error when it found that the State's conduct in this case was not reckless. The clearly erroneous standard presents a difficult hurdle to those seeking to overturn factual findings on appeal: "[I]f there is any competent evidence to support [a] factual finding[] below, [then] th[at] finding[] cannot be held to be clearly erroneous." *Morrison v. State*, 490 Md. 99, 110 (2025) (per curiam) (quoting *Satterfield v. State*, 483 Md. 452, 463 (2023)).

In Santana I, the State specifically asked Cpl. Cartwright whether there was a cellphone on the floor in Exhibit 178, and he responded in the affirmative. It was rational for the State to assume that Cpl. Cartwright would similarly have testified in Santana II, i.e., that he would have testified about the cellphone and refrained from mentioning the

18

excluded evidence, given that the State confirmed that it had prepped Cpl. Cartwright that it was looking for information about the cellphone.

During Santana II, the State gave Cpl. Cartwright his supplemental report only when Cpl. Cartwright confirmed that the address for the search warrant would be included on that supplement, as opposed to the original report that he currently had. Even then, the State twice instructed Cpl. Cartwright to "put away" the supplemental report after it had refreshed his recollection as to the *address*. When the State began questioning Cpl. Cartwright about certain photographs, the State initially asked Cpl. Cartwright whether there was "anything *significant to the investigation*" in State's Exhibit 175, but defense counsel objected, arguing that the State was leading. (Emphasis added). While the State's question, "[D]id you collect anything in that room?" regarding State's Exhibit 176 was open-ended, in that it did not specifically ask about a cellphone, that perhaps is explained, as the circuit court noted, by the immediately preceding objection from defense counsel about the nature of the question. The State rationally could have sought to avoid another objection by generally asking Cpl. Cartwright whether he collected anything from the room depicted in State's Exhibit 176.

And, perhaps most importantly, at the bench conference in Santana II when defense counsel moved for a mistrial, the State unequivocally indicated that it was not intending to elicit a response about the excluded evidence and that it viewed Cpl. Cartwright's testimony regarding the excluded evidence as a "surprise[]" and "out of left field."

Equally important as what the record discloses is what it does not disclose. Almost

19

four years elapsed between Santana I and Santana II. The record does not reveal an explanation for why the State waited so long to retry Mr. Santana. But the record also does not show that *defense counsel* took any steps to bring the agreement about the excluded evidence to the forefront before Santana II. For example, there is no evidence that defense counsel asked the State, prior to Santana II, whether the agreement would apply to any future prosecution, nor is there evidence that defense counsel reminded the State about the existence of the agreement and that it was proceeding in Santana II as if that agreement were still in effect.[13]

Before the circuit court were the facts that the State (1) prepped Cpl. Cartwright on the testimony it was seeking to elicit (recovery of the cellphone), (2) gave Cpl. Cartwright the supplemental report only when he asked for it, (3) twice instructed Cpl. Cartwright to put away the supplemental report once it refreshed his recollection as to the address where he executed the search warrant, and (4) admitted that Cpl. Cartwright's testimony about the excluded evidence was not at all what it was anticipating him to say. Additionally, before the circuit court was the absence of any fact regarding whether defense counsel took steps to reconfirm the existence/applicability of the parties' agreement made prior to Santana I. All of that is more than enough competent evidence to sustain the circuit court's credibility determinations regarding the State's level of culpability and the court's ultimate finding that the State's conduct did not rise to the

---

[13] We do not suggest that one party cannot be reckless simply because of another party's failure to act. Rather, this is merely one fact we consider among a multitude in evaluating whether the circuit court had competent evidence to support its factual determinations.

level of recklessness. *See Morrison*, 490 Md. at 110.[14]

Mr. Santana can succeed on appeal *only* if he can show that there was no competent evidence in the record to support the circuit court's factual determination as to recklessness. We, thus, do not address in detail his arguments because they simply amount to a disagreement as to how to view the State's conduct. While Mr. Santana's characterization of the State's conduct in this case may be plausible, that plausibility does not otherwise negate the competent evidence discussed above that supports the circuit court's finding that the State was not reckless. And that plausibility certainly is not grounds for us to substitute our judgment for that of the circuit court's. *See Woodlin v. State*, 484 Md. 253, 293 (2023) ("Armed with plausible interpretations supporting either side, we will not superimpose our judgment over the [circuit court's] well-supported determination." (citing *State v. Matthews*, 479 Md. 278, 305 (2022))).[15]

---

[14] Given that a finding of fact is not clearly erroneous if there is "*any* competent evidence to support [it,]" *Morrison*, 490 Md. at 110 (emphasis added), we necessarily are not limited to simply the reasons proffered by the circuit court. Instead, we view the entirety of the record before us, "viewing the evidence in the light most favorable to the prevailing party—here the State[,]" *Portillo Funes*, 469 Md. at 462.

[15] In his dissent, Justice Biran takes a similar approach. Relying on the facts that (1) there was an overlapping Assistant State's Attorney in both Santana I and Santana II, (2) the State did not explicitly inform Cpl. Cartwright to avoid mentioning the excluded evidence, (3) the State handed over the supplemental report, (4) the State used Exhibit 176 (the panoramic image of the bedroom) rather than Exhibit 178 (the image of the cellphone) in attempting to elicit testimony about the cellphone, and (5) the State asked an open-ended question "[t]he only conclusion one can reasonably draw . . . is that the State consciously disregarded its agreement not to offer [the excluded evidence]." Dissenting Op. of Biran, J., at 17–22. We disagree with Justice Biran that this is the "only" conclusion that one can draw. As discussed above, there is competent evidence in the record to support the circuit court's factual findings and credibility determinations that the State was not reckless in this case. That is enough to affirm its ruling.

# V
## CONCLUSION

Assuming—without deciding—that Maryland's common law double jeopardy protections bar retrial where a defendant successfully moves for mistrial based on reckless State conduct, we hold that the circuit court's finding that the State's conduct in this case was not reckless is not clearly erroneous. The circuit court made a finding of fact that the State was not reckless, and the record discloses competent evidence to support that finding. We, therefore, affirm the judgment of the Appellate Court and affirm Mr. Santana's convictions.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. PETITIONER TO PAY COSTS IN THIS COURT.**

Circuit Court for Charles County
Case No.: 08-K-17-000083
Argued: October 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 19

September Term, 2025

_____

MIGUEL ANGEL SANTANA

v.

STATE OF MARYAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Dissenting Opinion by Biran, J.,
which Watts and Gould, JJ., join.

_____

Filed: April 28, 2026

This Court granted certiorari to decide: (1) whether Maryland's common law prohibition on double jeopardy should bar retrial after a defendant successfully moves for a mistrial, where the mistrial was caused by the State's reckless conduct; and (2) if so, whether the State was reckless in this case. The Majority does not answer the first question. Rather, the Majority assumes without deciding that a recklessness standard applies, and upholds the circuit court's finding that the State did not act recklessly in eliciting the highly prejudicial evidence that led to Mr. Santana's second mistrial.

One is left to wonder why the Court granted certiorari in this case. In my view, whether the circuit court clearly erred in finding a lack of recklessness, standing alone, would not have warranted this Court's review. We had an opportunity in this case to decide important questions concerning Maryland's common law of double jeopardy – questions for which, as the Majority notes, this Court serves as the final arbiter. Unfortunately, the Majority decided not to answer these questions.

As a matter of Maryland common law, I would reject the standard set forth in *Oregon v. Kennedy*, 456 U.S. 667 (1982), under which a retrial after mistrial is barred under the Fifth Amendment only where the prosecution intentionally goaded the defendant into moving for the mistrial. I would hold that retrial after a mistrial is barred where the prosecution recklessly injects error into a trial that is so unfairly prejudicial that it leaves the defense with no real choice except to move for a mistrial and leaves the trial court with no real choice except to grant a mistrial. Applying that standard to this case, I would hold that the State acted recklessly in preparing and questioning the witness who testified improperly, and that the State's reckless conduct necessitated a mistrial. Because a third

trial of Mr. Santana should be barred under Maryland's common law of double jeopardy, I respectfully dissent.

I

The mistrial at issue relates to the manner in which the State prepared and elicited testimony from one of its witnesses, former Corporal Stephen Cartwright of the Charles County Sheriff's Office's Forensic Science Unit, at Mr. Santana's second trial in 2023.

A few months after the killing of Lydell Wood, law enforcement officers executed a search warrant at Mr. Santana's home and collected marijuana and several firearms, among other things, from the master bedroom. The marijuana and firearms were unrelated to the Wood shooting. Approximately six months after the search, the State secured an indictment charging Mr. Santana with first-degree murder and related offenses in connection with the shooting of Mr. Wood. The State believed that some of the evidence officers seized in the search of Mr. Santana's home – including a cellphone found in the same bedroom as the marijuana and firearms – was relevant to the murder charges. However, because the State acknowledged that the marijuana and firearms were unrelated to the Wood shooting, the State agreed prior to Mr. Santana's first trial in 2019 to instruct its witnesses to avoid testifying about the marijuana and firearms.

On direct examination of Corporal Cartwright at the first trial, the State asked him about four photographs – Exhibits 175, 176, 177, and 178 – that officers executing the search warrant took within Mr. Santana's home. Exhibit 175 is a photograph of a ground-floor closet. Exhibits 176, 177, and 178 are photographs of the master bedroom. Exhibit 176 is the most panoramic image of the three bedroom photos; it shows a bed, a window,

2

and two dressers, among other things. Exhibits 177 and 178 focus on particular parts of the bedroom. With respect to the three photos of the bedroom, the State elicited the following from Corporal Cartwright:

> [THE STATE]: Okay, and looking at 176, what is that?
>
> [CORPORAL CARTWRIGHT]: That's a view of the master bedroom upstairs.
>
> [THE STATE]: And what about 177?
>
> [CORPORAL CARTWRIGHT]: That's another view of the master bedroom, looking at a ... sorry, the dresser that was just inside the door.
>
> [THE STATE]: And what about 178?
>
> [CORPORAL CARTWRIGHT]: It's a view of the area of the bed that we saw in the first picture, just the inside of it.
>
> [THE STATE]: *Okay, and is there a phone on the floor in 178?*
>
> [CORPORAL CARTWRIGHT]: Yes, ma'am, there's a phone right there.

(Emphasis added). Exhibit 178 is the only photo of the bedroom that shows a cellphone.

Later in the first trial, the State elicited similar testimony from another officer, Detective John Elliott:

> [THE STATE]: Okay. And what about 176?
>
> [DETECTIVE ELLIOTT]: This is the second floor master bedroom.
>
> [THE STATE]: Okay. What about 177?
>
> [DETECTIVE ELLIOTT]: This is a dresser within that same master bedroom.

3

[THE STATE]: Okay. And 178?

[DETECTIVE ELLIOTT]: It's a photograph of a cell phone that was located on the floor adjacent to the bed in the master bedroom between the wall and the bed.

[THE STATE]: Okay. And did you recover that cell phone?

[DETECTIVE ELLIOTT]: I did.

Thus, in keeping with the parties' agreement, at Mr. Santana's first trial the State did not elicit evidence about drugs or guns that the officers found in the bedroom. Indeed, the record reflects that the State took care to avoid eliciting any information about the guns and drugs found in Mr. Santana's bedroom, including by asking leading questions focusing on the cellphone found in the bedroom.

Mr. Santana's first trial ended in a hung jury as to four of the six charges in the indictment. The State elected to retry Mr. Santana on those four counts. It is undisputed that the parties' agreement to exclude evidence of the marijuana and firearms found in the bedroom carried over to Mr. Santana's second trial, which went forward in 2023, four years after the first trial.[1]

On direct examination at the second trial, the State showed Corporal Cartwright a report concerning the search to refresh his recollection about where the search was performed. This report describes the seizure of marijuana and firearms (among other things) from the master bedroom, but makes no mention of any cellphone. After refreshing

---

[1] Had the State told Mr. Santana's counsel prior to the second trial that they intended to offer evidence concerning the drugs and guns found in the bedroom, presumably Mr. Santana's counsel would have filed a motion *in limine* to exclude such evidence.

Corporal Cartwright's recollection with the report, the State offered Exhibits 175 through 178 into evidence. The State asked Corporal Cartwright a few questions about Exhibit 175 (the photo of the ground-floor closet), and then directed Corporal Cartwright's attention to Exhibit 176, the panoramic image of the master bedroom. After Corporal Cartwright confirmed that Exhibit 176 was a photograph of the master bedroom, the State asked, "[o]kay, did you collect anything in that room?" Corporal Cartwright answered in the affirmative. Instead of then following its approach from the first trial and directing Corporal Cartwright's attention to Exhibit 178 – the photograph showing the cellphone on the floor of the bedroom – the State simply asked Corporal Cartwright without qualification, "[o]kay, what did you collect?" Corporal Cartwright responded, "I believe we collected firearms and marijuana … ," at which point defense counsel objected, and a bench colloquy ensued. The defense stated that it was moving for a mistrial.

The State explained that it did not anticipate Corporal Cartwright would mention the drugs and guns; rather, the State expected Corporal Cartwright to testify about the cellphone, because "that is what we are talking about and getting into with Detective Elliott and everything else." However, at this point in the second trial, Detective Elliott had not yet testified. And the State acknowledged that Corporal Cartwright "is obviously focusing on everything he recovered, because he is answering the question with the report." Nevertheless, the State said that Corporal Cartwright's testimony came "out of left field."

When the circuit court asked directly whether the State had instructed Corporal Cartwright not to mention firearms in preparation for his testimony, the prosecutor responded that "[h]e was prepared," but that she did not "recall asking him specifically

5

about that line of questions." The court responded, "[o]kay, she is saying yes," indicating that it understood the prosecutor to have just represented that the State affirmatively instructed Corporal Cartwright not to discuss the firearms in his testimony. The prosecutor then clarified, "I didn't specifically say that."

Although the State initially indicated it opposed a mistrial, by the next day, the State no longer objected to Mr. Santana's motion. The trial court found that manifest necessity existed and granted the requested mistrial.

Mr. Santana subsequently moved to dismiss the charges against him, arguing that the State was reckless both (1) in its preparation of Corporal Cartwright by failing to notify him of the parties' agreement that the marijuana and firearms he recovered were inadmissible, and (2) by examining Corporal Cartwright in a way that "could only have elicited an answer discussing inadmissible evidence" that was highly prejudicial. At the hearing on the motion to dismiss, the State again indicated that it "had prepared Corporal Cartwright, had gone through his testimony," but had not instructed Corporal Cartwright to avoid mentioning the guns and drugs.

The circuit court denied Mr. Santana's motion to dismiss. Focusing primarily on the prosecutors' intent, the court explained, "And I think everything that happened, I don't think any of it was intentional to gain any sort of advantage, to prejudice [Mr. Santana]." The court added: "I don't even think it would meet the definition of reckless." That was the extent of the circuit court's analysis concerning recklessness.

The Appellate Court affirmed the circuit court's ruling. However, writing separately, Judge Nazarian found it "impossible not to see [the State's conduct] at least as

6

reckless," noting that the State not only "fail[ed] to prepare the corporal on the appropriate (and agreed upon) scope of his testimony," but it also "gave him a supporting document guaranteed to guide him outside the boundaries of the agreement," two entirely "preventable" errors. *Santana v. State*, No. 1572, Sept. Term, 2023, 2025 WL 601454, at *10-11 (Md. App. Ct. Feb. 25, 2025) (Nazarian, J., concurring). Recognizing that there was no evidence that the State intended to cause a mistrial, Judge Nazarian nevertheless concluded that Corporal Cartwright's inappropriate testimony "wasn't merely an accident," and that the State's recklessness left "Mr. Santana no choice but to seek a mistrial that the court had no choice but to grant." *Id.* at *11.

## II

### A

This case presented an opportunity for the Court to decide both the question of when jeopardy attaches under Maryland common law, and under what circumstances the common law double jeopardy bar precludes retrial after a mistrial caused by the State's conduct. Resolving the threshold question of when jeopardy attaches would have been a significant step forward in clarifying Maryland common law on double jeopardy. Answering that question would also have been the logical first step in determining whether there is a common law double jeopardy bar to retrial after a mistrial, rather than determining, as the Majority does, whether the State engaged in reckless or intentional conduct. If, as the State asserts, under Maryland common law, "jeopardy d[oes] not attach until the rendition of a verdict and ... therefore, a retrial following the declaration of a

7

mistrial d[oes] not give rise to a double jeopardy problem[,]" Maj. Op. at 15, there was no need for the Majority to address the nature of the State's conduct at trial.

I would explicitly hold as a matter of Maryland common law that – consistent with the Fifth Amendment – jeopardy attaches in a jury trial when the jury is empaneled and sworn. *See, e.g.*, *Downum v. United States,* 372 U.S. 734 (1963); *Serfass v. United States*, 420 U.S. 377 (1975).

The implication in the Majority opinion that this Court may be open to providing a lower floor than the federal standard as to when jeopardy attaches is disconcerting. This Court on occasion has held that our common law double jeopardy doctrine applies even where the Fifth Amendment would not provide relief to a defendant. A case in point is *State v. Taylor*, where this Court held that, under Maryland common law, jeopardy can attach *pretrial*, i.e., where a trial judge erroneously grants a pretrial motion to dismiss based on a finding of insufficient evidence. 371 Md. 617, 644 (2002). The Fifth Amendment has not been held to bar the prosecution from seeking the reversal of such an erroneous ruling and the reinstatement of the dismissed charges.

Any suggestion that our common law doctrine should travel back in time to an archaic and impoverished understanding of double jeopardy interests runs afoul of the spirit and trajectory of Maryland law.

The Majority also declines to address the legal standard of prosecutorial misconduct that would bar retrial. The Majority cites no reason for dodging this cert-worthy question, perhaps because there is no good reason to do so. Contrary to the Majority's apparent assessment, I agree with Judge Nazarian that "this case presents an appropriate opportunity

8

for our Supreme Court to consider whether the [*Oregon v. Kennedy*] standard protects a defendant's double jeopardy rights adequately." *Santana v. State*, 2025 WL 601454, at *20 (Nazarian, J., concurring). Indeed, this case is an ideal vehicle for review of this important question, offering facts that cleanly present the issue without any procedural defects. Moreover, the question before us is one that many state high courts have addressed since the Supreme Court handed down *Oregon v. Kennedy* more than 40 years ago. Not only is this opportunity to enshrine double jeopardy protections in Maryland common law ripe; this Court's status as a latecomer to the issue allows the Court to assess the strengths and weaknesses of alternative legal standards adopted by other state high courts that have departed from *Oregon v. Kennedy*. *See, e.g.*, *State v. Rogan*, 984 P.2d 1231, 1246-50 (Haw. 1999); *Thomas v. Eighth Jud. Dis. Ct.*, 402 P.3d 619, 625 (Nev. 2017); *State v. Breit*, 930 P.2d 792, 800 (N.M. 1996); *State v. Kennedy*, 666 P.2d 1316, 1324 (Or. 1983); *Commonwealth v. Johnson*, 231 A.3d 807, 826 (Pa. 2020). The parties have fully briefed this question. We should answer it.

The Majority's reticence is inconsistent with this Court's approach in prior cases. In the course of the concurrent[2] and independent evolution of Maryland's common law on double jeopardy, this Court has looked beyond form to reach substance and thereby interpreted double jeopardy in a manner that furthers the doctrine's underlying purposes. *See, e.g.*, *Taylor*, 371 Md. at 648 ("Although cloaked in the form of the grant of motions

_____

[2] I mean concurrent with developments in federal constitutional law and in other states' constitutional and common law.

9

to dismiss, the substance of the trial judges' rulings was to grant judgments of acquittal and so must we treat them for double jeopardy analysis."); *Block v. State*, 286 Md. 266, 273-74 (1979) (explaining that "an improper or defective exercise of jurisdiction does not deprive an acquittal of its finality"). Where warranted, this Court has also departed from its usual common law practice to animate the purposes of double jeopardy. *See Middleton v. State*, 318 Md. 749, 760 (1990) (striking sentence for first-degree rape despite usual practice to strike the sentence for the lesser offense where defendant was improperly sentenced twice for two merged offenses, because the sentence for second-degree rape had become final before sentence for first-degree rape was imposed).

We can and should do so again here.

**B**

The doctrine of double jeopardy was recognized as a universal maxim of English common law as early as the thirteenth century. *Bartkus v. Illinois*, 359 U.S. 121, 152-53 (1959) (Black, J., dissenting). As a universal principle of public justice, the doctrine can be found today "in varying forms, not only in the Federal Constitution, but in the jurisprudence or constitutions of every State, as well as most foreign nations." *Id.* at 154. "The Fifth Amendment's prohibition against placing a defendant 'twice in jeopardy' represents a constitutional policy of finality *for the defendant's benefit* in federal criminal proceedings." *United States v. Jorn*, 400 U.S. 470, 479 (1971) (emphasis added). Indeed, "[a] power in government to subject the individual to repeated prosecutions for the same

10

offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial." *Id.*

However, a defendant's right not to be placed twice in jeopardy for the same offense, like most rights of constitutional pedigree, is not absolute. In determining whether a retrial after mistrial shall be permitted or prohibited, a defendant's important double jeopardy interests must be weighed against the government's interests in securing just convictions. *See Wade v. Hunter*, 336 U.S. 684, 689 (1949) (observing that "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments"). The overarching understanding of double jeopardy, therefore, is that while "the State with all its resources and power should not be allowed to make repeated attempts" to prosecute an individual, *Green v. United States*, 355 U.S. 184, 187-88 (1957), the State cannot be limited in every case to "a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws." *Jorn*, 400 U.S. at 479.

In the retrial-after-mistrial context, this framework contemplates a distinction between prosecutorial negligence that causes severe prejudice and prosecutorial overreaching that causes severe prejudice. Indeed, prior to *Oregon v. Kennedy*, the Supreme Court drew this very distinction. In *Jorn*, the plurality opined that "where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." 400 U.S. at 485; *see also United States v. Dinitz*, 424 U.S. 600, 607 (1976).

In *Oregon v. Kennedy*, the Supreme Court narrowed the scope of prosecutorial overreaching sufficient to bar retrial after mistrial to a highly specific circumstance: where the prosecution intentionally goads the defendant into moving for a mistrial. *Kennedy*, 456 U.S at 679. At the heart of my disagreement with *Kennedy* (and the State's defense of *Kennedy*'s reasoning) is that the intentional goading rule eviscerates the defendant's right to have their case decided by the particular jury that was hearing the evidence. From the defendant's perspective, it does not matter whether the State thought it was winning the trial but nevertheless overreached in a way that necessitated a mistrial, or the State thought it was losing the trial and overreached in a way that necessitated a mistrial. In both instances, the State's overreaching renders the defendant's choice to continue with the tainted proceeding illusory. *See State v. Kennedy*, 666 P.2d at 1324 (on remand from the Supreme Court, reasoning that "[f]rom the standpoint of a defendant forced to choose between accepting prejudicial errors or undergoing a second trial, the precise degree of the official's mens rea is a matter of indifference").

To be sure, the State cannot realistically be expected in every case to vindicate the societal interest in law enforcement through the vehicle of a single proceeding for a given offense. *Jorn*, 400 U.S. at 483-84. Thus, even where prosecutorial or judicial negligence results in severe prejudice that cannot be cured short of a mistrial, retrial should be permitted. But when prejudice that necessitates a mistrial results from prosecutorial or judicial overreaching – which includes both intentionally or recklessly injecting severe prejudice into a trial – the defendant's interest in not being retried outweighs the State's interest in having a do-over.

12

*Kennedy*'s intentional goading rule fails to give effect to our common law double jeopardy doctrine as a guarantee of individual rights rather than a sanction against misbehaving officials. *See, e.g.*, *State v. Shields*, 49 Md. 301, 304-05 (1878) (under Maryland common law of double jeopardy, a verdict "must stand as an effective protection to the accused"); *Giddins v. State*, 163 Md. App. 322, 333 (2005) (recognizing the purpose of double jeopardy as protection of the defendant's right to have the trial completed by the original tribunal); *Fields v. State*, 96 Md. App. 722, 733-34 (1993) (same).

In addition, the rationale to bar retrial under double jeopardy extends beyond the circumstance of a prosecutor intentionally goading the defendant to move for mistrial because the prosecutor is worried that the State is going to lose the trial. A retrial should also be impermissible where the prosecutor brought the defendant to trial for the purpose of harassment. *See Kennedy*, 456 U.S. at 689 (Stevens, J., concurring) (no retrial should be permitted where "a prosecutor may be interested in putting the defendant through the embarrassment, expense, and ordeal of criminal proceedings even if he cannot obtain a conviction"). In such a case, "with the purpose of harassing the defendant the prosecutor may commit repeated prejudicial errors and be indifferent between a mistrial or mistrials and an unsustainable conviction or convictions." *Id.*

Nor should a mistrial be permitted where a prosecutor intentionally injects severe prejudice into the trial for the purpose of winning the trial. *See id.* (no retrial should be permitted "when the prosecutor seeks to inject enough unfair prejudice into the trial to ensure a conviction but not so much as to cause a reversal of that conviction"); *Thomas*, 402 P.3d at 626 (same).

13

And no retrial should be permitted where a prosecutor injects severe prejudice into a trial in conscious disregard of the risk of necessitating a mistrial – i.e., where the prosecutor acts recklessly. *See State v. Kennedy*, 666 P.2d at 1326. On remand from the U.S. Supreme Court's decision in *Kennedy*, the Oregon Supreme Court became the first state high court to reject the federal test. It adopted a broader test under the state Constitution, barring retrial where "improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and … the official knows that the conduct is improper and prejudicial and *either intends or is indifferent* to the resulting mistrial or reversal." *Id.* (emphasis added); *see also Johnson*, 231 A.3d at 826 (recklessness); *Breit*, 930 P.2d at 803 ("willful disregard"); *Pool*, 677 P.2d at 271-72 ("any improper purpose with indifference to a significant resulting danger of mistrial or reversal"); *Thomas*, 402 P.3d at 626 (same as *Pool*). When a prosecutor injects such severe prejudice into a trial that a mistrial is necessary, the balancing of interests that double jeopardy requires tilts in the defendant's favor.

Prosecutorial recklessness by itself does not require a bar to retrial. There must also be a judicial finding that the prosecutor's reckless (or intentional) conduct *necessitated* a mistrial. In other words, the prejudice resulting from the prosecutor's misconduct has to be so severe that the defendant had no choice but to move for a mistrial and the trial court had no choice but to grant the requested mistrial. These additional components of the test I would adopt address any concern that the recklessness standard is unduly broad and would sweep in any error regardless of mens rea, the chief concern motivating the Supreme Court

14

to adopt the intentional goading standard.[3] Under a recklessness test, a defendant will still have a substantial burden to demonstrate that a retrial is barred by double jeopardy.

The recklessness standard leaves the State plenty of room to try criminal cases zealously. Prosecutors are still empowered to elicit testimony that is arguably admissible due to the lack of a controlling ruling or an agreement on inadmissibility. In the absence of a controlling ruling or an agreement in the case that certain evidence is inadmissible, if the State elicits such evidence and doing so results in such severe prejudice that a mistrial is required, my test would not bar retrial. A retrial would be barred only where the prosecutor: (1) knows or should know that a controlling ruling or an agreement between the parties in the case bars the introduction of specific evidence; (2) elicits such evidence in contravention of the ruling or agreement; and (3) the inadmissible evidence results in such severe prejudice that the defendant has no choice but to move for a mistrial and the court has no choice but to grant a mistrial.[4]

---

[3] In *Kennedy*, the Supreme Court pointed to "confusion" in lower courts that it believed was caused by *Jorn*'s and *Dinitz*'s references to "prosecutorial or judicial overreaching." 456 U.S. at 678-79. But *Jorn* and *Dinitz* were neither written nor intended to provide lower courts with a specific test to determine what constitutes impermissible prosecutorial or judicial overreaching to bar retrial after mistrial. What the *Kennedy* Majority characterized as "confusion" is simply how common law develops in lower courts; and in the case of state courts, an intended and necessary feature of federalism. *See* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 HARV. L. REV. 489, 491 (1977) ("the full realization of our liberties cannot be guaranteed" without the concurrent and independent evolution of state law). The fact that different federal courts pre-*Kennedy* and different state courts post-*Kennedy* have articulated different tests to determine the level of misconduct (overreaching) that triggers a bar to retrial says little about the workability of a non-intentional-goading rule.

[4] Because this case concerns eliciting prejudicial evidence, I have phrased the test in terms of evidence. Reckless prosecutorial conduct during other parts of a trial (e.g.,

Although this test places a heavy burden on a defendant, it is not insurmountable. The same cannot be said of *Kennedy*'s intentional goading test. *See Pool*, 677 P.2d at 271 (intentional goading test "involves a subjective inquiry [that] is too difficult to determine"). If proving intentional goading were not a Sisyphean task, one would expect to find at least a single reported case anywhere in the 44 years since *Kennedy* was decided in which a court has found such intentional goading and barred retrial. The State cites no such case, and I have found none. In any case, as the New Mexico Supreme Court said of the intentional goading test in the course of rejecting it, "[t]he succinctness and manageability of a standard of law does not necessarily bespeak its justness or applicability to the problem it is intended to address." *Breit*, 930 P.2d at 798.

The State argues that a difficult choice between allowing an imperfect trial to proceed or seeking a second trial that promises its own risks is "not the same as no choice." Respondent's Br. at 34 (citation omitted). The State overlooks that, in some instances, severely prejudicial error removes real choice from the equation. Even without a crystal ball to tell a defendant whether a retrial would be just as bad as or worse than the present one, the prejudice may be so severe that the defendant has no real choice except to ask the court to declare a mistrial. In those circumstances, retaining primary control over the course to be followed must encompass more than the free will to opt for the only reasonable course that can be followed.

---

closing argument) may also result in a mistrial after which double jeopardy should bar a retrial.

16

## III

Like Judge Nazarian, I would conclude that the State acted recklessly in this case. The trial court clearly erred in finding to the contrary.

## A

Prior to Mr. Santana's first trial, the parties reached an agreement to exclude evidence of the drugs and guns found in his bedroom. That agreement reflected the parties' understanding that such evidence was irrelevant to the offenses the State would be seeking to prove at trial. In addition, it must have been clear to all concerned that evidence establishing Mr. Santana's possession of firearms and drugs in his bedroom would be highly prejudicial in this case, where the State charged Mr. Santana with murdering Lydell Wood with a firearm.

At Mr. Santana's first trial, when questioning Corporal Cartwright and Detective Elliott, the State, to its credit, took care not to elicit evidence about drugs or guns that the officers found in the bedroom. Among other things, the prosecutor asked leading questions focusing on the cellphone found in the bedroom.

At the bench conference during the second trial, following the State's open-ended question and Corporal Cartwright's severely prejudicial answer, a prosecutor who participated in both trials confirmed that the agreement to exclude evidence of the drugs and guns carried through to the second trial. That being the case, it was crucial that the prosecutors tell Corporal Cartwright not only what they *wanted* him to discuss (the cellphone), but also what he *could not mention* (the drugs and guns).

17

The same prosecutor who confirmed the existence of the parties' agreement claimed that Corporal Cartwright's improper testimony came "out of left field." I do not take issue with the trial court's determination that the prosecutors were truthful when they said they were surprised that Corporal Cartwright testified as he did. The trial court's finding that the State did not *intentionally* elicit the improper testimony is not clearly erroneous.

Recklessness is a different story. The trial court's ruling on that point consisted of one conclusory sentence: "I don't even think it would meet the definition of reckless." The court did not say what the "definition of reckless" is. Nor did the court address in any respect what the prosecutors should have known or taken into consideration in their preparation and questioning of Corporal Cartwright.

It is often the case that, at first, we are surprised when our reckless conduct leads to a bad outcome. But, upon reflection, if we are honest with ourselves, we recognize that we consciously disregarded a substantial and unjustifiable risk that a reasonable person would have anticipated. That is the case here. The prosecutors could not say that, upon reflection, Corporal Cartwright's testimony came out of left field. They had hit the ball into left field by preparing Corporal Cartwright four years after the first trial without instructing him not to mention the drugs and guns,[5] and by asking him an open-ended question about what the

---

[5] The Majority says that the prosecutor told the circuit court at the bench conference that she "could not recall" whether the prosecutors "instructed [Corporal Cartwright] *not to discuss* the excluded evidence[.]" Maj. Op. at 5. However, in response to the trial court's question, "Did you say, 'Listen, don't mention the firearms'?," after first saying that she did not "recall asking him specifically about that line of questions," the prosecutor acknowledged that she "didn't specifically say that" – meaning that she did not specifically tell Corporal Cartwright to avoid mentioning the firearms. Similarly, at the hearing on the motion to dismiss the charges based on double jeopardy, the other prosecutor told the court

18

officers seized in the bedroom. In addition, before asking Corporal Cartwright that question, the State showed him his supplemental report, which references the inadmissible drugs and guns with no mention of a cellphone. As Judge Nazarian pointed out, the State "gave [Corporal Cartwright] a supporting document guaranteed to guide him outside the boundaries of the agreement – or else they prepped him with a document that didn't comply with the agreement." *Santana*, 2025 WL 601454, at *11 (Nazarian, J., concurring). Indeed, at the bench conference, one of the prosecutors acknowledged that Corporal Cartwright "is obviously focusing on everything he recovered, because he is answering the question with the report." The circuit court sarcastically responded to that observation, "Okay, wonderful."[6] Moreover, when the State decided to show Corporal Cartwright a photograph immediately before asking him what was seized from the bedroom, the State (unlike at the first trial) did not direct his attention to Exhibit 178, the only photograph of the cellphone. Rather, the State showed Corporal Cartwright Exhibit 176, the panoramic image of the

---

that cellphones were "all we had talked about, we had never mentioned, elicited or talked to [Corporal Cartwright] about marijuana or firearms."

[6] This exchange reveals the weakness of the Majority's reliance on the fact that the State twice told Corporal Cartwright to put the report away after using it to refresh his recollection about the address of the search. *See* Maj. Op. at 19, 20. Telling a witness to put an unadmitted document away after refreshing their recollection is standard operating procedure. There is no reason to believe that the prosecutor told Corporal Cartwright to put the report away because it was concerned that it might lead him to mention drugs and firearms when the prosecutor got to that part of his testimony. In addition, the transcript does not reflect which parts of the report Corporal Cartwright reviewed, how long he spent doing so, and whether he actually put the report away. In this regard, I put more stock in the prosecutor's contemporaneous evaluation of the significance of the report in explaining the improper testimony than in the Majority's emphasis on the State's directive to put the report away.

19

bedroom that does not depict a cellphone. Given all these circumstances, it was to be expected that Corporal Cartwright would pick up the ball the prosecutors had hit into left field and throw it back to the infield.

The Majority notes that, at the first trial, the State specifically asked Corporal Cartwright whether there was a cellphone on the floor in Exhibit 178, and he responded in the affirmative. According to the Majority, it was "rational for the State to assume" that Corporal Cartwright would testify the same way in the second trial after the prosecutors "prepped [him] that it was looking for information about the cellphone." Maj. Op. at 18-19. I disagree. Given that four years had passed since the first trial, it was reckless, not rational, for the State to assume that Corporal Cartwright would only mention that police recovered a cellphone from the bedroom, regardless of how the prosecutor put the question to him.

By asking the open-ended question, "what did you collect [from the master bedroom]," the State directed the examination to one of two possible outcomes: Corporal Cartwright would either provide a truthful answer to the question, which would include reference to drugs and firearms, or if he chose only to refer to a cellphone, he would provide only a partially truthful answer. In the circumstances of this case, putting Corporal Cartwright in that position was reckless.[7] The State either should have qualified the

---

[7] The Majority notes that the defense had objected to a more narrowly worded question as impermissibly leading earlier in Corporal Cartwright's testimony, *see* Maj. Op. at 19, and speculates that the prosecutor may have asked the open-ended question to avoid another objection. However, the circuit court overruled the earlier objection. If the State had intended to elicit information about the cellphone by way of a question that was not open-ended, out of concern that Corporal Cartwright might otherwise refer to drugs and firearms, it was reckless to abandon that approach in the hope that he would answer an

20

question, asking Corporal Cartwright something along the lines of, "What did you collect, if anything, that is relevant to this trial?," or the prosecutors should have explicitly instructed him in their prep session(s) not to mention the drugs and firearms. Law enforcement officers are not legal scholars and cannot be expected to know the myriad evidentiary rules governing admissibility; that is the province of the attorney conducting direct examination. For prosecutors in particular, the risk of unfairly prejudicing a criminal defendant by introducing inadmissible evidence is and should be at the forefront of their minds as they pursue a just criminal conviction. *See Santana v. State*, 2025 WL 601454, at *20 (Nazarian, J., concurring) ("[P]rosecutors are and should be held to higher standards."); *see also* Md. Rule 19-303.8, cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.").[8] Moreover, four years had passed since

---

open-ended question narrowly. The State should have posed the question more narrowly and, if necessary, explained its concern to the trial court at a sidebar.

[8] The Majority's suggestion that Mr. Santana's trial counsel bear some responsibility for the State's failure to properly prepare and question Corporal Cartwright, *see* Maj. Op. at 20 & 20 n.13, is a red herring. The prosecutors did not need defense counsel to remind them about the agreement to exclude evidence of the drugs and firearms. To the contrary, the prosecutors acknowledged that they were aware of the agreement and told the circuit court that they did not expect their questioning of Corporal Cartwright to lead to a breach of that agreement. Moreover, the State has not argued that defense counsel's actions or inactions have any bearing on whether the prosecutors were reckless. That is probably because the State is appropriately wary of shifting burdens to criminal defendants that belong to prosecutors. The Majority's failure to follow the State's lead in this regard is puzzling.

the prosecutors instructed Corporal Cartwright to avoid mentioning the firearms at Mr. Santana's first trial. It was reckless for the prosecution to assume that Corporal Cartwright would do so again without an explicit instruction from the prosecutors.

The only conclusion one can reasonably draw from these series of events is that the State consciously disregarded its agreement not to offer evidence of the drugs and guns. Put another way, the State knew or should have known that the way it questioned Corporal Cartwright would lead him to testify about the drugs and guns. The State indisputably remembered that it had an agreement that this evidence was inadmissible. Yet, through a combination of actions and inactions, the State elicited that severely prejudicial evidence.

Unlike the purely subjective inquiry of gauging specific intent, assessing recklessness requires an analysis of actual and constructive knowledge; the latter necessarily entails the objective standard of what a reasonable person in the prosecutor's shoes would have recognized as "a substantial and unjustifiable risk that certain harm would result." Maj. Op. at 16. The points upon which the Majority relies to affirm the trial court's ruling speak to the prosecutors' actual knowledge and intent, not to their constructive knowledge and whether a reasonable prosecutor would have recognized a substantial and unjustifiable risk of incurable prejudice. The prosecutors' expectation that they would elicit evidence only relating to cellphones and their surprise in the moment of Corporal Cartwright's mention of drugs and firearms is competent evidence to negate a specific intent to goad Mr. Santana into moving for a mistrial. But these facts individually and collectively do not speak to the question of whether the State should have known of

the substantial and unjustifiable risk of eliciting highly prejudicial testimony.[9] Even in assuming without deciding that the recklessness standard applies, the Majority's analysis fails to meaningfully engage with the mens rea that Mr. Santana asks this Court to consider.

**B**

In requesting a mistrial, defense counsel stated that Corporal Cartwright's improper testimony "infected the case" and "there is no way to un-ring the bell." I agree. However, it does not inevitably follow from the inability to "un-ring" the bell that the prejudice was so severe that it necessitated a mistrial. When "judicial or prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire 'to go to the first jury and, perhaps, end the dispute then and there with an acquittal.'" *Dinitz*, 424 U.S. at 608 (quoting *Jorn*, 400 U.S. at 484).

---

[9] To the extent that the Majority's assertion that the trial judge accepted the prosecutor's representation of surprise is informed by *United States v. Vallejo*, 297 F.3d 1154, 1162-63 (11th Cir. 2002), no meaningful analogy can be drawn between the facts there and this case. In *Vallejo*, a state witness inadvertently testified in a way that could be construed as commenting on the defendant's post-arrest silence. *Id.* In the absence of any prior agreement to exclude between the parties, the defendant argued that the prosecutor intentionally provoked a mistrial because the inadmissible testimony was exactly what the prosecutor was expecting to elicit. *Id.* The prosecutor stated on the record that the inadmissible testimony came as a surprise, which the trial court found credible and relevant to the question of specific intent. *Id.* Here, however, Mr. Santana argues that the prosecutor's misconduct was reckless, not intentional. Even setting aside the prosecutor's actual knowledge of the parties' prior agreement to exclude, under the recklessness standard, it matters not that the prosecutor was "surprised" by Corporal Cartwright's inadmissible testimony, if a reasonable person in the prosecutor's position would have anticipated the resulting incurable prejudice. The parties here also do not dispute the prosecution's expectation. Therefore, the Majority's reliance on the prosecutors' surprise is misguided. It is not competent evidence from which the trial judge could have inferred the absence or presence of recklessness because it is not relevant evidence for that inquiry.

In this case, the trial court made a finding – albeit without substantive analysis – that manifest necessity existed to grant a mistrial. I agree with that finding. Mr. Santana did not have a real choice to continue with the trial once the jury heard that officers recovered firearms in his bedroom. To convict Mr. Santana of first-degree murder, the State had to establish Mr. Santana's ownership of or access to a firearm at the time of the shooting, for which no other evidence was admitted. This evidentiary gap goes to the heart of Mr. Santana's guilt or innocence, and to bridge it the State had to rely on the strength of other evidence in the record. The parties understood that any improper testimony about the firearms seized at Mr. Santana's home would unfairly narrow the evidentiary gap in the jurors' minds, at the expense of Mr. Santana's right to due process. That is why the parties agreed to exclude evidence of the recovered firearms at both trials. No reasonable defendant in Mr. Santana's position would choose to go forward with the trial once the jury heard that police recovered firearms from Mr. Santana's bedroom. No matter how much the defense may have been pleased with the jury that was empaneled for the second trial, the defense understood that the likelihood of a conviction on the murder charge skyrocketed after the jury heard that Mr. Santana had firearms in his bedroom. The prosecutor's overreaching left the defense with no choice but to request a mistrial and left the court with no choice but to grant that request.

Accordingly, I would reverse the judgment of the Appellate Court and remand this case to the trial court with the instruction to dismiss the remaining charges.

Justice Watts and Justice Gould have authorized me to state that they join this opinion.

24